**2021 UT App 120**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ELBERT JOHN PAULE,
Appellant.

Opinion
No. 20200555-CA
Filed November 12, 2021

Fourth District Court, Provo Department
The Honorable Lynn W. Davis
No. 191400658

Douglas J. Thompson and Margaret P. Lindsay,
Attorneys for Appellant

Sean D. Reyes and Nathan Jack,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES GREGORY K. ORME and DAVID N. MORTENSEN concurred.

HARRIS, Judge:

¶1 Elbert John Paule shot and killed his friend (Friend), and police later discovered the weapon used in the shooting—a shotgun—lying in the grass below the balcony of Paule's apartment. Paule was charged with, among other things, murder (for shooting Friend) and obstruction of justice (for allegedly throwing the shotgun off the balcony). After a nine-day trial, a jury credited Paule's account that he shot Friend in self-defense and acquitted him of murder, but nevertheless convicted him of obstruction of justice. Paule now appeals that conviction, asserting that the trial court erred by denying his motion to arrest judgment and that his trial attorneys rendered ineffective assistance. We affirm.

BACKGROUND[1]

¶2     Paule and Friend became acquainted a month or two prior to the shooting. While the depth of their friendship was not entirely clear from trial testimony, witnesses testified that Paule and Friend often spent time together hanging out, eating dinner, and playing video games, and that Paule had stayed the night at Friend's residence several times. However, in the days leading up to the shooting, their relationship began to deteriorate, and the two of them exchanged heated words, largely through digital messages. At one point, Paule suggested that the two of them settle their dispute with a fight; Friend, for his part, told Paule that he was going to come over to Paule's apartment so the two could "fight it out," that it was not "going to end good for [Paule]," and that he was going to "take [Paule] out." Paule later testified that he took these threats seriously and was concerned for his safety.

¶3     On the day of the shooting, Friend—with his fiancée (Fiancée) and infant child in tow—went over to Paule's apartment, ostensibly to "squash the beef" between himself and Paule. Accompanied by Fiancée and their infant, Friend climbed the three flights of stairs to Paule's apartment and knocked on the door. Paule was home at the time and, fearing it was Friend at the door, went into his bedroom to retrieve his shotgun. Accounts differ as to whether Friend or Paule opened the door first, and as to whether Friend had a knife in his hand, but one thing is certain: as soon as Paule realized that Friend was standing in his doorway, and before any meaningful dialogue

---

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *Layton City v. Carr*, 2014 UT App 227, ¶ 2 n.2, 336 P.3d 587 (quotation simplified).

occurred, Paule pulled the shotgun's trigger and fatally shot Friend.

¶4 After the shooting, Paule fled the scene, allegedly assaulting Fiancée in his attempt to escape the apartment. Somehow, the shotgun made its way down onto the grass below the balcony of Paule's apartment, and Paule's phone was lost—and never found—during his departure from the apartment complex. Paule then traveled to California, where he eventually turned himself in to the local authorities and was extradited back to Utah. The officer who booked Paule into jail in California asked Paule if he knew why he was being taken into custody, and Paule responded: "I'm here for murder" and "I used a shotgun."

¶5 After investigation, the State charged Paule with four crimes: (1) murder, a first-degree felony; (2) obstruction of justice, a second-degree felony; (3) reckless endangerment, a class A misdemeanor; and (4) assault, a class B misdemeanor. The case eventually proceeded to a jury trial, which lasted nine days. During his opening statement at trial, the prosecutor explained to the jury that the murder charge was "for shooting and killing" Friend; the obstruction of justice charge was for throwing the shotgun "off the balcony in order to hinder, delay, or prevent the investigation"; the reckless endangerment charge was for endangering Fiancée and the infant by "just randomly fir[ing]" a shotgun in their vicinity; and the assault charge was for "punch[ing]" and "push[ing]" past Fiancée after the shooting.

¶6 At trial, the State presented testimony from many witnesses, including Fiancée—who testified about what she saw at the time of the shooting—and several law enforcement officers. One of the officers testified that, while searching the apartment's balcony, he could see a "long rifle" or "shotgun" in the grass "almost directly below the balcony." Another officer

testified that he retrieved that gun—which he determined to be a shotgun—from the grass below the balcony, and he stated that the position in which the gun was found was consistent with it having been thrown to the ground. That same officer also testified that a live round was found in the chamber of the shotgun, and that the round inside the gun was "the same brand" as the spent shell casing discovered inside the apartment. And yet another officer testified that the only prints recovered from the shotgun were Paule's finger and palm prints.

¶7     At the close of the State's case, Paule moved for a directed verdict as to the obstruction of justice count. In support of that motion, Paule made one argument: that the State had presented insufficient evidence indicating that it had been Paule—as opposed to someone else—who had thrown the shotgun off the balcony. During argument on the motion, which took place outside the jury's presence, all participants (including the court) appeared to assume that the obstruction of justice count concerned *only* the allegation that Paule had attempted to dispose of the shotgun; indeed, inherent in Paule's request—which asked the court to order an acquittal on the obstruction count—was the notion that the only thing Paule had been accused of doing that could constitute obstruction of justice was throwing the gun off the balcony. The State opposed the motion on the sole ground that there existed "sufficient circumstantial evidence" that Paule had been the person who threw the gun off the balcony. That is, the State did not assert any other factual bases on which the jury could convict Paule of obstruction of justice. The court denied the motion, concluding that, based on the circumstantial evidence, "the jury could make a determination" that Paule had been the one who threw the gun off the balcony.

¶8     Paule testified in his own defense, and gave a much different account of the shooting than Fiancée, claiming that he shot Friend in self-defense. He also testified that he did not do

anything with the shotgun after the shooting, and instead claimed that one of his roommates took the shotgun from his hands and "ran out to the balcony."

¶9 After Paule rested his case, the trial court instructed the jury. The instruction for the obstruction of justice charge stated that the jury could not convict Paule unless it was able to find, beyond a reasonable doubt, that Paule had "conceal[ed] or remove[d] any item or other thing" with the "intent to hinder, delay, or prevent the investigation . . . of any person regarding conduct that constitutes a criminal offense." The court also instructed the jury that, "[i]n all criminal cases, including this case, the unanimous agreement of all jurors is required before a verdict can be reached." No further instruction regarding jury unanimity was given.

¶10 During closing argument, the prosecutor discussed the obstruction of justice charge and—as he had during his opening statement—made clear to the jury that this charge was for "when [Paule] threw the gun over the balcony." He pointed out that "only [Paule's] prints [were] on that" gun, and urged the jury to convict Paule on the obstruction charge because the evidence indicated that Paule had been the one who threw the gun off the balcony. At no point did the prosecutor identify any other act as being the basis for the obstruction of justice charge, nor did he ask the jury to convict Paule on that count for any other act.

¶11 At certain points in his closing argument, the prosecutor mentioned that Paule had "got rid of" his phone while fleeing the scene and that Paule had traveled to California immediately thereafter. But these comments were made much earlier in the argument than the prosecutor's discussion of the obstruction charge, and were made in the context of discussing Paule's guilt on the murder charge. The prosecutor prefaced the discussion by saying, "[n]ow, as to Paule's guilt" on the murder charge, and argued that a person who was truly scared of Friend and who

had acted in self-defense would not have "got rid of his phone" and "fled to" California.

¶12   The jury ultimately acquitted Paule of murder, reckless endangerment, and assault, but convicted him of obstruction of justice. Paule subsequently filed a motion to arrest judgment, arguing that the jury's verdict was legally inconsistent because "the jury found [Paule] was legally justified" in shooting Friend and that there had been "no crime for [Paule] to obstruct." Paule therefore asked the court to either enter an acquittal on the obstruction of justice charge or, in the alternative, to reduce Paule's conviction from a second-degree felony to a class A misdemeanor. In its written opposition to Paule's motion, the State continued to take the position that the obstruction of justice count had been about Paule throwing the shotgun off the balcony. But at oral argument on the motion, the State for the first time asserted that there might have been other factual bases upon which the jury might have convicted Paule of obstruction of justice, including disposing of his phone and fleeing to California. After argument, the trial court denied Paule's motion.

¶13   A few weeks later, at Paule's sentencing hearing, the State asked the court to deviate from the sentencing guidelines— which indicated that probation would be appropriate—and sentence Paule to prison. As part of its argument, the State represented that it had spoken "with the jurors" and that they had "mentioned" three things Paule did that they thought might have constituted obstruction of justice: throwing the shotgun off the balcony; disposing of the cell phone; and "absconding to California." The State discussed all three of those things in its argument, and urged the court to deviate from the guidelines because, among other reasons, Paule had taken "deliberate and intentional steps to obstruct not only the investigation, but to obstruct the entire prosecution." Paule's attorney objected to the State's discussion of anything that jurors might have told the State after trial, and asked the court to strike those statements;

the court granted that request. Nevertheless, at the conclusion of the sentencing hearing the court sentenced Paule to prison, consistent with the State's request.

ISSUES AND STANDARDS OF REVIEW

¶14 Paule appeals his obstruction of justice conviction, and asks us to consider two issues. First, he asserts that the trial court erred when it denied his motion to arrest judgment; among other things, he argues that his conviction for obstruction of justice is legally inconsistent with his acquittal on the other charges. "We review a trial court's ruling on a motion to arrest judgment for correctness." *State v. Hand*, 2016 UT App 26, ¶ 10, 367 P.3d 1052; *see also Pleasant Grove City v. Terry*, 2020 UT 69, ¶ 11, 478 P.3d 1026 (noting that "legally impossible verdicts involve a question of law" and that such questions are reviewed "for correctness").

¶15 Second, Paule asserts that his trial attorneys rendered ineffective assistance by failing to object to allegedly incomplete jury instructions. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Beckering*, 2015 UT App 53, ¶ 18, 346 P.3d 672 (quotation simplified).

ANALYSIS

I

¶16 Paule challenges the trial court's denial of his motion to arrest judgment and, in support of that challenge, makes two independent arguments. First, he takes issue with the conviction as a whole, asserting that the guilty verdict on the obstruction of justice charge is legally inconsistent with his acquittal on the

other charges and should therefore be vacated. Second, he takes issue with the level of conviction, arguing in the alternative that even if the verdict is not legally inconsistent, there is insufficient evidence to support a felony conviction, and asks that the conviction be instead entered as a misdemeanor. We address each of Paule's arguments, in turn, and reject them because they are grounded in a misinterpretation of the obstruction of justice statute.

## A

¶17    Paule's first argument—for complete vacatur of his conviction—is that the jury's verdict was legally inconsistent. As Paule sees it, his conviction for obstruction of justice is inherently inconsistent with his acquittals on the remaining counts, because the acquittals mean that there was no underlying criminal conduct to obstruct. We first discuss the obstruction of justice statute, including material amendments made in 2001, and then address the merits of Paule's argument.

## 1

¶18    Prior to 2001, a person could be found guilty of obstruction of justice under Utah law if that person "conceal[ed], destroy[ed], or alter[ed] any physical evidence that might aid in the discovery, apprehension, or conviction of [an] offender," and did so "with intent to hinder, prevent, or delay the discovery, apprehension, prosecution, conviction, or punishment of another *for the commission of a crime*." Utah Code Ann. § 76-8-306(1)(f) (Lexis Supp. 2000) (emphasis added).

¶19    In 2001, our legislature materially amended the obstruction of justice statute. Among other changes, the legislature added "investigation" to the list of things that an actor cannot hinder, delay, or prevent without potentially committing obstruction of justice. *See* Act of Apr. 30, 2001, ch. 307, § 2, 2001 Utah Laws 1385, 1385. And, notably for present

purposes, the legislature deleted "for the commission of a crime" and replaced that text with "regarding conduct that constitutes a criminal offense," and then included a statutory definition of the phrase "conduct that constitutes a criminal offense." *Compare* Utah Code Ann. § 76-8-306(1), *with* Act of Apr. 30, 2001, at 1385–86. According to that definition, "'conduct that constitutes a criminal offense' means conduct that *would be* punishable as a crime and is separate from a violation of this section, and includes . . . any violation of a criminal statute or ordinance of this state." Act of Apr. 30, 2001, at 1386 (emphasis added).

¶20 Thus, under current Utah law, as relevant here, "[a]n actor commits obstruction of justice if the actor" does any one of ten enumerated acts with the "intent to hinder, delay, or prevent the investigation . . . of any person regarding . . . conduct that *would be* punishable as a crime." *See* Utah Code Ann. § 76-8-306(1), (2)(a) (LexisNexis Supp. 2021) (emphasis added).[2] In our view, the 2001 amendments broadened the scope of the statute. The inclusion of the word "investigation" bespeaks a legislative intent to criminalize interference with law enforcement criminal investigations, and not just the apprehension, prosecution, conviction, or punishment of persons who commit crimes. And the replacement of the phrase "commission of a crime" with the phrase "conduct that constitutes a criminal offense," along with the inclusion of the statutory definition of that phrase—especially that definition's use of the conditional verb construction "would be"—indicates legislative intent that obstruction of justice can be present even if the underlying conduct is never ultimately found to constitute a crime. Indeed, we have previously so held. *See State v. Hamilton*,

---

2. Because the current iteration of the statute is not materially different, for purposes of this case, from the version of the statute in effect at the time of the shooting, we cite the current statute for convenience.

2020 UT App 11, ¶ 15, 457 P.3d 447 (stating that "the obstruction of justice statute does not require a conviction of the underlying crime").

¶21    In this case, the enumerated act Paule was accused of committing was "alter[ing], destroy[ing], conceal[ing], or remov[ing] any item or other thing." *See* Utah Code Ann. § 76-8-306(1)(c). Thus, to obtain a conviction, the State needed to prove, beyond a reasonable doubt, that Paule (1) concealed or removed the shotgun (2) with the intent to hinder, delay, or prevent an investigation (3) into "conduct that *would be* punishable as a crime." *See id.* § 76-8-306(1)(c), (2)(a) (emphasis added).

2

¶22    Citing *Pleasant Grove City v. Terry*, 2020 UT 69, 478 P.3d 1026, Paule asserts that the verdict in this case is "legally impossible." In Paule's view, it is impossible to reconcile the jury's conviction for obstruction of justice with the jury's acquittal on all other counts. As Paule sees it, the jury's verdict means that no underlying crime was ever committed, and that therefore no criminal conduct ever occurred whose investigation he could have been guilty of obstructing. We reject Paule's argument because *Terry* does not apply here, and because Paule misinterprets the obstruction of justice statute.

¶23    In *Terry*, our supreme court determined that a defendant who was "acquitted on [a] predicate offense but convicted on [a] compound offense" was subject to a "legally impossible" verdict and, in that situation, the defendant's conviction on the compound offense had to be vacated. *Id.* ¶¶ 54, 56. The court distinguished between "legally impossible" verdicts and "factually inconsistent" verdicts, and held that the former "cannot stand" while the latter are sometimes permissible. *Id.* ¶¶ 38, 56. The court defined "legally impossible" verdicts as those "that are inconsistent as a matter of law because it is impossible to reconcile the different determinations that the jury

would have had [to] make to render them." *Id.* ¶ 13 (quotation simplified). The court also noted that its decision was "narrow" and "limited" to situations "in which a defendant is acquitted on the predicate offense but convicted on the compound offense." *Id.* ¶ 54.

¶24    *Terry* simply does not apply here. Neither murder nor any of the other charges on which Paule was acquitted is a predicate offense for an obstruction of justice conviction. *See* Utah Code Ann. § 76-8-306(1). A person can legally be convicted of obstruction of justice without also being convicted of murder, reckless endangerment, or assault. Indeed, as noted, a person can legally be convicted of obstruction of justice even in the absence of *any* conviction on *any* underlying crime. *See Hamilton*, 2020 UT App 11, ¶ 15. The verdict the jury rendered here is simply not a "legally impossible" verdict as defined in *Terry*.

¶25    Moreover, Paule's argument is founded on an incorrect interpretation of the obstruction of justice statute. As Paule sees it, the statute requires the presence of underlying "conduct that constitutes a criminal offense," *see* Utah Code Ann. § 76-8-306(1), and he contends that there was no such conduct here because the jury acquitted him of all underlying charges. But Paule overlooks the included statutory definition of the phrase "conduct that constitutes a criminal offense." As noted, our legislature defined that phrase as "conduct that *would be* punishable as a crime." *See id*. § 76-8-306(2)(a) (emphasis added). In particular, Paule overlooks the legislature's use of the conditional verb form "would be" in the statutory definition. "When we interpret statutes, our primary objective is to ascertain the intent of the legislature," and that intent is sometimes expressed through verb tense or verb form. *See Scott v. Scott*, 2017 UT 66, ¶ 22, 423 P.3d 1275 (quotation simplified); *see also id.* ¶ 24 ("A statutory reading that credits a verb's tense is not uncommon."). Because "the best evidence of the legislature's

intent is the plain language of the statute itself, we look first to the plain language of the statute." *Id.* ¶ 22 (quotation simplified). "In so doing, we presume that the legislature used each word advisedly," including verb tense and verb form. *Id.* ¶¶ 22, 24 (quotation simplified). In our view, the legislature's choice to use a conditional verb form ("would be") in the obstruction statute indicates that the underlying conduct need not necessarily result in a criminal conviction.

¶26 Indeed, the legislature added the word "investigation" to the statute in 2001, along with the amendment that defined "conduct that constitutes a criminal offense." *See* Act of Apr. 30, 2001, ch. 307, § 2, 2001 Utah Laws 1385, 1385–86. Since 2001, it has been a crime to interfere with an "investigation" of any person regarding "conduct that would be punishable as a crime." *See* Utah Code Ann. § 76-8-306(1), (2)(a). Thus, in cases like this one where the allegation is that the actor hindered a law enforcement investigation, the statutory focus is squarely placed on the conduct being investigated at the time of the alleged obstruction, and not necessarily on any conduct that a factfinder ultimately finds, after trial, to have actually occurred. If the conduct under investigation at the time of the alleged obstruction "would be punishable as a crime," then that conduct qualifies as "conduct that constitutes a criminal offense," as that phrase is statutorily defined. *See id.*

¶27 And all of this remains true, under the statutory language, even if it is later determined—whether by law enforcement officers or prosecutors who decide not to file charges, or by a jury who acquits—that no underlying criminal activity occurred. *See Hamilton*, 2020 UT App 11, ¶ 15 (stating that "the obstruction of justice statute does not require a conviction of the underlying crime—it simply requires a finding that the defendant took certain actions with the intent to hinder, delay, or prevent the investigation . . . of any person regarding conduct that constitutes a criminal offense" (quotation simplified)). Paule's

argument—that the jury's acquittal on the underlying counts is inconsistent with his conviction for obstruction—founders principally because the conduct ultimately found to have occurred by the jury on the underlying charges is, in this case, not particularly relevant to the obstruction count. Instead, the conduct that matters for purposes of the obstruction count is twofold: (a) the actions Paule took that allegedly constitute obstruction, and (b) the underlying conduct being investigated at the time of the alleged obstruction.

¶28 Paule's contrary interpretation of the statute is not only incompatible with the statutory text, but could also lead to seemingly absurd results and could incentivize individuals to commit even more obstruction. Imagine a situation in which a driver is involved in an auto-pedestrian accident with a fatality, but the driver observed all traffic laws and did not act even negligently, let alone intentionally. The driver panics, however, upon seeing that the pedestrian died and—before police arrive, and out of a concern that police might think a homicide was committed—takes the body and hides it in a nearby ditch. Police investigate the incident, based on the evidence found at the crash site, as a potential homicide, and while conducting that investigation they discover the body and learn that the driver attempted to conceal it. Later, however, police conclude that the crash was completely accidental and that no provable criminal conduct occurred in connection with it, and no underlying criminal charges are ever filed. Under Paule's interpretation of the statute, the driver could never be charged with obstruction of justice for hiding the body, because there was no underlying conduct that constituted a criminal offense. But Paule's interpretation is incorrect: in this situation, the driver can still be charged with obstruction of justice, even though there is no underlying criminal conduct, because at the time of the obstruction the police were investigating a potential homicide, and the driver hid the body with the intent to hinder or delay that investigation. The possible homicide being investigated is

"conduct that would be punishable as a crime" if the facts end up turning out the way police investigators suspect, and therefore that conduct, under the applicable statutory definition, is "conduct that constitutes a criminal offense," even though such conduct may never actually be proved or even prosecuted. *See* Utah Code Ann. § 76-8-306(1), (2)(a).

¶29   In addition, Paule's interpretation of the obstruction statute would incentivize individuals interested in obstructing justice to go all out in such efforts, because if they hinder the investigation well enough to prevent any convictions on the underlying charges, they will be immune from conviction for obstruction of justice as well. Such a result is not only incompatible with the text of the statute, but it is a result that is unlikely to have been intended by legislative drafters.

¶30   Thus, the jury's ultimate conclusion that Paule acted in self-defense in shooting Friend does not insulate him from charges that he obstructed justice by impeding the investigation into the underlying incident. At the time Paule threw the shotgun off the balcony, police were investigating (or were about to start investigating) potential criminal conduct associated with the shooting death of Friend. Put in terms of the statutory text, that investigation was "regarding conduct . . . that would be punishable as a crime" if the facts had developed as suspected. *See id.* The jury's later acquittal of Paule on the underlying charges does not mean that the State failed to prove any of the elements of obstruction of justice. In appropriate cases, when supported by the facts, a defendant who is acquitted on the underlying charges may still—without any inconsistency in the verdict—be convicted of obstruction of justice.

¶31   Accordingly, we conclude that the jury's verdict in this case was not legally impossible, as that term is discussed in *Terry*, and that the trial court correctly rejected Paule's argument to the contrary in denying his motion to arrest judgment.

B

¶32    Second, and in the alternative, Paule takes issue with the level of his conviction, and asserts that the trial court erred when it refused to reduce his obstruction of justice conviction from a second-degree felony to a class A misdemeanor. At trial, during proceedings in connection with the motion to arrest judgment, as well as here on appeal, Paule couches these arguments in terms of insufficiency of the evidence—that is, he asserts that the evidence presented at trial was insufficient to support a conviction as a second-degree felony, as opposed to a misdemeanor. In assessing a sufficiency of the evidence challenge, we will reverse only where "the evidence is sufficiently inconclusive or inherently improbable such that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime for which he or she was convicted." *State v. Jok*, 2021 UT 35, ¶ 17, 493 P.3d 665 (quotation simplified). That standard is not met here, and on that basis we reject Paule's argument.

¶33    Under Utah law, obstruction of justice can constitute either a second-degree felony, a third-degree felony, or a class A misdemeanor, depending on the severity of the "conduct that constitutes an offense." *See* Utah Code Ann. § 76-8-306(3). Obstruction of justice is a second-degree felony "if the conduct which constitutes an offense would be a . . . first degree felony," but it is a class A misdemeanor if, among other reasons, the underlying offense is a misdemeanor. *See id.* The State charged Paule with second-degree-felony obstruction of justice, asserting that the investigation he obstructed was about whether Paule (or someone else) had committed first-degree murder.

¶34    Paule contends that, because he was ultimately charged with three different underlying counts—one first-degree murder charge and two misdemeanor charges—"it is impossible to know whether the underlying offense" found by the jury "was

murder, endangerment, assault, or some other offense." Paule thus asserts that the evidence is insufficient to support a second-degree-felony conviction in this case.

¶35    But there was copious evidence in the record to support a determination that the investigation at issue here was principally an investigation of a potential first-degree felony. In this case, police were clearly investigating Friend's death as a possible murder. Just two days after the shooting, police charged Paule with first-degree murder; indeed, in the initial information filed in this case, that was the *only* charge the State brought against him. And on that very same day, when Paule turned himself in to officers in California, he told them—in response to their query as to what he was being held for—that he was "here for murder."

¶36    We therefore have no trouble concluding that sufficient evidence existed to support a determination that the underlying investigation concerned conduct that would be punishable as a first-degree felony. Accordingly, the trial court did not err in denying Paule's motion to arrest judgment.[3]

---

3. In a related argument, Paule asserts that his trial attorneys rendered ineffective assistance by failing to request an additional instruction that might have further defined the phrase "conduct that constitutes a criminal offense," and for failing to request some unspecified mechanism—perhaps a special verdict form—that would have allowed the jurors to "inform the court which *conduct that constitutes a criminal offense* they determined beyond a reasonable doubt Paule acted to obstruct." Paule devotes less than one page to this argument; to the extent Paule's argument here intends to incorporate by reference his earlier contentions regarding his interpretation of the obstruction of justice statute, we reject that argument for the same reasons already articulated.

(continued…)

II

¶37 Next, Paule asserts that his trial attorneys rendered constitutionally ineffective assistance by failing to object to the absence of a specific instruction regarding jury unanimity. In particular, Paule asserts that certain evidence at trial supported three different factual bases on which the jury might have found that he had obstructed justice—throwing the gun off the balcony, disposing of his phone, and fleeing to California—but notes that he was charged with only one count of obstruction, and he correctly observes that the jury was not instructed that any guilty verdict needed to be unanimous with regard to which factual episode formed the basis for the conviction. Paule faults his attorneys for not asking for a specific instruction in this regard, and asserts that the outcome of the case would have been different if they had. We find Paule's argument unpersuasive because the State offered the jury only one potential basis upon which to ground a conviction for obstruction of justice.

¶38 To establish that his attorneys rendered constitutionally ineffective assistance, Paule must show both (1) that his attorneys' performance was deficient, in that it "fell below an objective standard of reasonableness," and (2) that this deficient

---

(…continued)

But even assuming, without deciding, that Paule's trial attorneys performed deficiently in failing to request these items, Paule does not carry his burden of persuading us that there exists a reasonable likelihood of a different result if they had, especially in light of other evidence in the record, including Paule's own admission (to the California officer) that he knew he was "here for murder." *See State v. Scott*, 2020 UT 13, ¶ 43, 462 P.3d 350 ("The burden is on the defendant to demonstrate a reasonable probability that the outcome of his or her case would have been different absent counsel's error.").

performance "prejudiced the defense" such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984); *accord State v. Scott*, 2020 UT 13, ¶ 28, 462 P.3d 350; *State v. Ray*, 2020 UT 12, ¶ 24, 469 P.3d 871. "A defendant must satisfy both parts of this test in order to successfully establish ineffective assistance." *State v. Whytock*, 2020 UT App 107, ¶ 26, 469 P.3d 1150. Thus, "it is unnecessary for a court to address both components of the inquiry if we determine that a defendant has made an insufficient showing on one." *Id.* (quotation simplified).

¶39    The first part of the test requires Paule to show that his attorneys' performance "fell below an objective standard of reasonableness." *Scott*, 2020 UT 13, ¶ 31 (quotation simplified). In evaluating the reasonableness of trial counsel, courts will often look to whether counsel acted strategically by taking the disputed action. *See id.* ¶ 35 ("[T]he performance inquiry will often include an analysis of whether there could have been a sound strategic reason for counsel's actions."). "If it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance." *Ray*, 2020 UT 12, ¶ 34.

¶40    Paule's claim of ineffective assistance raises the issue of a non-unanimous jury verdict on the obstruction of justice charge. Specifically, Paule asserts that some (but not all) members of the jury could have believed that he obstructed justice by throwing the shotgun off the balcony, some (but not all) members of the jury could have believed that he obstructed justice by disposing of his phone, and still other (but not all) members of the jury could have believed that he obstructed justice by fleeing to California; in that event, Paule could have been convicted of obstruction of justice even though not all jurors would have agreed that he committed any particular act of obstruction. Because the jurors were not instructed that they had to agree on

the act underlying the obstruction charge, Paule contends that the instructions were not legally correct and that his trial attorneys were ineffective for not objecting to them.

¶41  Paule correctly understands Utah's jury unanimity jurisprudence. Our state constitution provides that "[i]n criminal cases the verdict shall be unanimous." Utah Const. art. I, § 10. "At its most basic level, this provision requires the full concurrence of all empaneled jurors on their judgment as to the criminal charges submitted for their consideration." *State v. Hummel*, 2017 UT 19, ¶ 25, 393 P.3d 314. Additionally, it is "well-established" that our constitutional unanimity requirement "'is not met if a jury unanimously finds only that a defendant is guilty of a crime.'" *See id.* ¶¶ 26, 30 (emphasis omitted) (quoting *State v. Saunders*, 1999 UT 59, ¶ 60, 992 P.2d 951). Our constitution "requires unanimity as to each count of each distinct crime charged by the prosecution and submitted to the jury for decision." *Id.* ¶ 26 (emphasis omitted). Indeed, "a generic 'guilty' verdict that does not differentiate among various charges would fall short," as would "a verdict of 'guilty of some crime.'" *Id.* ¶¶ 26–27. For example,

> a verdict would not "be valid if some jurors found a defendant guilty of robbery committed on December 25, 1990, in Salt Lake City, but other jurors found him guilty of a robbery committed January 15, 1991, in Denver, Colorado, even though all jurors found him guilty of the elements of the crime of robbery."

*Id.* ¶ 28 (quoting *Saunders*, 1999 UT 59, ¶ 60). "These are distinct counts or separate instances of the crime of robbery, which would have to be charged as such." *Id.*

¶42  In *State v. Alires*, 2019 UT App 206, 455 P.3d 636, we held that a jury verdict violated constitutional unanimity principles where a defendant was charged with "six identically-worded

counts" of sexual abuse, the counts were not distinguished by act or alleged victim, the victims described more than six acts that could have qualified as abuse, and the jury convicted the defendant on only two counts. *See id.* ¶¶ 22–23. This situation was problematic because "the jurors could have completely disagreed on which acts occurred or which acts were illegal." *Id.* ¶ 23. And even more recently, in *State v. Mendoza*, 2021 UT App 79, we applied these principles to the obstruction of justice statute, and concluded that "the obstruction of justice statute's various ways to perform the actus reus of the crime constitute alternative elements, the commission of any one of which could satisfy that statutory element, but which also require the jury to agree that the same underlying criminal act has been proved beyond a reasonable doubt." *See id.* ¶ 13 (quotation simplified). In *Mendoza*, we held that a trial attorney performed deficiently in an obstruction of justice case by failing to request a specific jury unanimity instruction or a special verdict form that would have required the jury "to specify which statutorily prohibited act [the defendant] engaged in." *Id.* ¶ 16.

¶43  In cases like these, jury unanimity problems can be mitigated in one of two ways. First, a trial court can give a specific jury unanimity instruction—over and above the general unanimity instruction, *see* Model Utah Jury Instructions 2d CR216 (2018), https://www.utcourts.gov/resources/muji/inc_list.asp?action=showRule&id=30#216 [https://perma.cc/TY2Y-DCEA] —informing the jurors that "all of them must agree that the same underlying criminal act has been proved beyond a reasonable doubt."[4] *See State v. Vander Houwen*, 177 P.3d 93, 99 (Wash. 2008)

---

4. While there exists a model Utah jury instruction discussing the general unanimity requirement, there does not exist a model instruction regarding specific unanimity as to the underlying factual circumstance. We urge the Advisory Committee on

(continued…)

(en banc) (quotation simplified), *quoted with approval in Alires*, 2019 UT App 206, ¶ 22. Alternatively, the prosecutor can specifically identify for the jury—usually in opening statement or in closing argument—"which act supported each charge." *See Alires*, 2019 UT App 206, ¶ 22; *see also State v. Santos-Vega*, 321 P.3d 1, 18 (Kan. 2014) (stating that, in order to remedy a jury unanimity problem, "either the State must have informed the jury which act to rely upon for each charge . . . or the [trial] court must have instructed the jury to agree on the specific criminal act for each charge"), *quoted with approval in Alires*, 2019 UT App 206, ¶ 22; *Mendoza*, 2021 UT App 79, ¶¶ 19–20 (noting that, if the prosecutor had "put[] all his eggs in one basket" and identified "one particular action" that formed the basis for the obstruction charge, the court "might be inclined to" reject the defendant's ineffective assistance of counsel claim "for lack of prejudice"); *Whytock*, 2020 UT App 107, ¶ 31 (observing that the State could have used the jury instructions or closing arguments to "indicate to the jury which factual occasion was the one being charged").

¶44 In this case, Paule correctly notes that he was charged with only one count of obstruction of justice. He alleges, however, that the State put on evidence of three distinct underlying acts that each could have independently formed the basis for a conviction on that count. Paule therefore contends that, as in *Alires*, "the jurors could have completely disagreed on which acts occurred or which acts were illegal," and yet could have nonetheless convicted him of obstruction of justice. *See* 2019 UT App 206, ¶ 23.

¶45 We disagree with Paule's characterization of the evidence and arguments presented at trial. At no point during trial did the

---

(…continued)
Model Utah Criminal Jury Instructions to consider including such an instruction in its set of model instructions.

prosecutor ever argue that the obstruction count was for any act other than throwing the shotgun off the balcony. To the contrary, the State consistently maintained during trial, in representations made both to the jury and outside its presence, that the underlying act for which it sought conviction for obstruction was the act of throwing the shotgun off the balcony. During his opening statement, the prosecutor informed the jury that the obstruction count was for "when, after he shot [Friend], [Paule] took that shotgun, [and] threw it off the balcony in order to hinder, delay, or prevent the investigation." During the mid-trial argument regarding the directed verdict motion, the State again made clear its view that the act underlying the obstruction count was only the act of throwing the shotgun off the balcony. And in his closing argument, the prosecutor reemphasized that the obstruction charge was for "when [Paule] threw the gun over the balcony," and asked for a conviction on that count because "only [Paule's] prints are on that" gun and that fact, combined with other evidence, indicated that Paule had been the one who threw the gun off the balcony.

¶46   Paule resists this conclusion by directing our attention to the fact that the jury heard evidence that Paule lost his phone while leaving the apartment complex and that he fled to California immediately thereafter, and to comments made by the prosecutor during closing argument discussing that evidence. But in our view, Paule misperceives the context in which this evidence was introduced and discussed. The prosecutor discussed that evidence during closing only in connection with his argument on the murder charge, not on the obstruction charge, and only as a way to discuss Paule's potential consciousness of guilt and to argue that Paule did not shoot Friend out of self-defense; specifically, the prosecutor argued that a person who was truly scared of Friend and who had acted in self-defense would not have "got rid of his phone" and "fled to" California. These comments were not reasonably likely to have diluted the State's otherwise-clear position: that it was

asking for an obstruction of justice conviction *only* for the act related to the shotgun, and not for any acts related to the cell phone or flight to California.[5]

¶47    And any comments the State made after the jury had been discharged—for instance, at sentencing, or in defending against Paule's motion to arrest judgment—cannot have had any effect on the jury's perception of the factual basis for the obstruction charge. Without commenting on whether those comments were well-advised, we can readily conclude that any comment made days or weeks after the jury's discharge cannot possibly have countermanded or diluted, in the jury's mind, the reach of the State's otherwise-clear guidance to the jury regarding the scope of the obstruction charge.

---

5. The trial court struck from the record any statements proffered by the State that jurors had told prosecutors that they considered the other acts—related to the phone and flight to California—to be in play related to the obstruction of justice charge. Not only have those comments been stricken from the record, and on that basis alone are not to be considered on appeal, our consideration of those comments would appear to violate at least two rules of evidence. *See* Utah R. Evid. 606(b)(1) (stating that "a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment"); *id.* R. 802 ("Hearsay is not admissible except as provided by law or by these rules."). Paule mentions these statements in his reply brief, even though he acknowledges that they are "inadmissible hearsay" and were stricken from the record. Those statements should not have been included in the reply brief, and we therefore grant the State's motion to strike all references to those statements; we do not consider them for any purpose in this opinion.

¶48 Therefore, in this case the State properly took advantage of one of the pathways identified in our case law to obviate any jury unanimity problem: it clearly identified for the jury which factual circumstance formed the basis for its obstruction of justice charge. *See Alires*, 2019 UT App 206, ¶ 22. And because the State made this clear to the jury, Paule's attorneys did not act unreasonably by electing not to seek further relief at trial. Thus, Paule cannot demonstrate that his attorneys performed deficiently, and on this basis we reject Paule's ineffective assistance of counsel claim.

CONCLUSION

¶49 The trial court did not err when it denied Paule's motion to arrest judgment because the jury verdict was not legally inconsistent. And Paule has failed to demonstrate that his trial attorneys rendered constitutionally ineffective assistance. Accordingly, we affirm Paule's conviction.

———————